# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| KEITH PLEZIA, | ) | CASE NO. 1:22-CV-01723-PAB |
| Plaintiff, | ) | |
| | ) | U.S. DISTRICT JUDGE |
| | ) | PAMELA A. BARKER |
| v. | ) | |
| | ) | U.S. MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | ) | JENNIFER DOWDELL ARMSTRONG |
| | ) | |
| Defendant, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.      INTRODUCTION

Plaintiff Keith Plezia ("Mr. Plezia") seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (ECF Doc. 1). U.S. District Judge Pamela A. Barker has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). Pursuant to Local Civil Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's decision.

## II.      PROCEDURAL HISTORY

On July 16, 2020, Mr. Plezia filed applications for DIB and SSI, alleging a disability onset date of January 29, 2020. (Tr. 164, 569, 579).[1] These applications were denied initially and upon reconsideration. (Tr. 569-78, 579-88, 591-601, 602-12). Mr. Plezia requested a hearing before an administrative law judge ("ALJ"). (Tr. 640-41). On September 3, 2021, the ALJ held a telephonic

---

[1] The administrative transcript ("Tr.") is located at ECF Doc. 6 on CM/ECF.

hearing due to the COVID-19 pandemic, during which Mr. Plezia, represented by counsel, and a vocational expert ("VE") testified. (Tr. 192-219).

On September 21, 2021, the ALJ issued a written decision finding that Mr. Plezia was not disabled. (Tr. 163-83). The ALJ's decision became final on August 25, 2022, when the Appeals Council denied further review. (Tr. 55-58). Mr. Plezia filed a Complaint on September 27, 2022. (ECF Doc. 1). He asserts the following assignment of error:

> (1) Whether the ALJ erred in analyzing persuasiveness regarding rejecting the medical opinions issued by the claimant's treatment providers

(ECF Doc. 8, PageID#1790).

## III.    BACKGROUND INFORMATION

### A.    Personal, Educational, and Vocational Experience

Mr. Plezia was born in 1976, and he was 43 years on the alleged disability onset date. (Tr. 182). He is unmarried, and he lives with his 13-year-old daughter. (Tr. 196). He is a high school graduate, and he does not have any other professional/vocational certification or license. (Tr. 197). He obtained a commercial driver's license for work but had not used it for approximately a year and a half at the time of the hearing due to an injury. (*Id.*). Mr. Plezia was unable to obtain a medical card for his commercial license. (Tr. 197-98). At the time of the hearing, he also possessed a personal driver's license with no restrictions. (Tr. 198). His past relevant work was employment as a trucker, route truck driver, and highway maintenance worker. (Tr. 181).

### B.    Relevant Hearing Testimony

#### 1.    *Mr. Plezia's Testimony*

Mr. Plezia testified how his physical conditions affect his ability to work. (Tr. 205). Specifically, he reported that he is unable to pass the requirements of the Department of Transportation physical to become certified to operate trucks. (*See id.*). He also testified that he

was treating his conditions with several medications. (Tr. 205-06). He testified that he experiences daily pain and fatigue. (Tr. 206). Due to these symptoms, he stated that he cannot work a normal work-day shift. (*Id.*). He also testified that he struggles with activities such as grocery shopping and household chores because he has difficulty standing or walking for longer than five minutes and requires the use of a cane or brace. (*See id.*). He stated that his daughter does the grocery shopping because he cannot stand with a shopping cart and walk throughout the store due to "excruciating" back pain and "excessive" walking. (*Id.*). He further testified that he eats microwaved meals and relies on his daughter to complete household chores such as cooking, doing laundry, sweeping, dusting, and cleaning rooms. (*See* Tr. 206-08). His father mows the lawn. (Tr. 208).

Mr. Plezia described his typical day. (Tr. 209-10). He testified that he usually goes to bed around 9 to 10 p.m., but he will normally wake up around 1 to 3 a.m. because he needs to use the restroom. (*See* Tr. 209). He is unable to fall back to sleep due to "constantly stressing out…[and] anxiety." (*Id.*). He "sometimes" falls asleep again, but at 6 a.m. he must wake up his daughter for school and then microwaves a meal for her to eat before school. (*Id.*). Other than that, he reported that he generally stays at home unless he has a doctor's appointment or must run an errand at the store. (*Id.*). At home, he browses the Internet and "just sit[s] there and just…ha[s] good days and…bad days." (*Id.*). He described most days as panic attacks, worry about the future, and a "good cry every day." (*Id.*). He is unsure if his cry is a "cry for help or a cry for why." (*Id.*). He usually falls asleep around 12 to 2 p.m., but he tries to help his daughter with her homework when she returns from school and ensures that she keeps up with the daily chores. (*See* Tr. 210). After that, he has dinner with his father and watches the news. (*See id.*).

Mr. Plezia testified that he gained 80 pounds as a result of his injury. (Tr. 211). He attributed this weight gain to "[s]tress, agony, lack of being about to be physical" and that he "just can't move around like [he] used to be able to, be active." (Tr. 211). He further testified that he uses a cane to walk up and down stairs. (*Id.*). Mr. Plezia testified that he uses a motorized scooter inside the store if he does any grocery shopping.  (Tr. 212).

Mr. Plezia also testified that he experiences a "gout attack" approximately twice a month, and his most recent attack occurred approximately two weeks before the hearing. (*Id.*). He stated that his knees, elbows, wrists, and left foot and ankle area are most affected by the gout. (*Id.*). When he has a gout flare up, Mr. Plezia testified that he typically cannot do anything for two to three days. (Tr. 213).

## 2. *Vocational Expert's Testimony*

Mr. Plezia's past relevant work was employment as a highway maintenance worker, trucker, and truck route driver. (Tr. 181, 215). As a first hypothetical, the ALJ asked the vocational expert ("the VE") whether a hypothetical individual of Mr. Plezia's age, education, and work experience could perform work if limited to work at the light exertional level, except that he can occasionally climb ramps and stairs; never climb ladders, ropes, and scaffolds; occasionally stoop, kneel, crouch, and crawl; cannot work at a production rate pace; can have frequent interaction supervisors, co-workers, and the public; and is limited to routine workplace changes. (Tr. 215-16). The VE opined that the individual could not perform past relevant work, but could perform other work as an inspector, small products assembler, and mail clerk. (Tr. 216).

The ALJ next asked whether a hypothetical individual with the same limitations and limitations as the first hypothetical, but reduced to the sedentary exertional level, could perform

work. (Tr. 216-17). The VE opined that the individual could not perform past relevant work, but could perform other work as an assembler, sorter, and inspector. (Tr. 217).

Mr. Plezia's counsel, adding to the ALJ's second hypothetical, asked whether an individual could perform work at the sedentary exertional level with an additional sit/stand at will limitation. (Tr. 217). The VE opined that this limitation would be work-preclusive. (Tr. 218). Counsel then asked the VE whether the individual from the second hypothetical could perform work at the sedentary exertional level with a limitation of rarely reaching in all directions and never pushing and pulling with the upper extremities. (*Id.*). The VE opined that this individual could not work. (*Id.*).

Mr. Plezia's counsel asked whether an individual with a limitation of an extra 30-minute break each work day, in addition to the standard lunch and two 15-minute breaks, would be able to sustain any competitive work activity for light and sedentary jobs. (*Id.*). The VE opined that this individual could not work. (*Id.*).

Finally, Mr. Plezia's counsel asked whether the hypothetical individual could perform work if the mental restriction of frequent interaction with supervisors, co-workers, and the public were instead changed to occasional and superficial interaction with supervisors, co-workers, and the public. (Tr. 218-19). The VE opined that this individual would still be able to perform work at the light or sedentary exertional level. (Tr. 219). If limited to no interaction with co-workers and the public and occasional and superficial interaction with supervisors, the VE opined that the hypothetical individual would not be able to perform work. (*Id.*).

### C.  Relevant Non-Medical/Medical Opinion Evidence

#### 1.  *State Agency Consultants*

##### a.  Medical Consultants

In October 2020, Dr. Lynne Torello, M.D., assessed the medical record at the initial level. Dr. Torello opined that Mr. Plezia's severe physical impairments were a back disorder, obesity, essential hypertension, and osteoarthritis. (Tr. 572). Dr. Torello further opined that Mr. Plezia was capable of performing work at the light level of exertion with additional postural limitations, including occasional climbing of ramps and stairs; never climbing ladders, ropes, or scaffolds; and occasionally stooping, kneeling, crouching, and crawling. (Tr. 574-75). Dr. Torello explained that she would not be adopting the prior administrative findings due to a work injury that occurred in January 2020. (Tr. 575). In February 2021, Dr. Maria Congbalay, M.D., assessed the medical record at the reconsideration level and agreed with Dr. Torello's findings. (Tr. 597-98).

### b.  Psychological Consultants

In October 2020, Dr. Paul Tangeman, Ph.D., assessed the medical record involving Mr. Plezia's mental impairments at the initial level. Dr. Tangeman opined that Mr. Plezia retained the ability to sustain attention, concentration, persistence, and pace to complete routine tasks that did not have fast paced performance or strict production quotas. (Tr. 576). Dr. Tangeman further opined that Mr. Plezia could sustain simple tasks, so long as they involved only superficial interactions with others, and these tasks took place in situations where duties were relatively static and changes could be explained. (*Id.*). In February 2021, Dr. Courtney Zeune, Psy.D., reviewed the medical record at the reconsideration level and agreed with Dr. Tangeman's findings. (Tr. 598-99).

### 2.  *Consultative Examiners*

### a.  Dr. Kahil Darr, M.D.

Dr. Darr, a consultative physical examiner, provided a medical opinion on October 12, 2017 - almost three years prior to the alleged disability onset date. Dr. Darr noted that Mr. Plezia

brought a cane with him, and that Mr. Plezia's gait was "slightly" antalgic with use of the cane and "more" antalgic without the cane. (Tr. 782). Dr. Darr opined that Mr. Plezia "probably" can stand/walk "maybe" six hours per day; sit and keep his left leg elevated during the workday; push and pull objects; manipulate objects; and operate hand control devices. (Tr. 784). Dr. Darr further opined that Mr. Plezia would be able to lift and carry between 14 and 20 pounds frequently and over 20 pounds occasionally. (*Id.*). Dr. Plezia opined that a cane would be medically necessary for both outdoors and indoors. (*Id.*).

### b. Dr. Ryan Wagner, Psy.D.

Dr. Wagner, a consultative psychological examiner, performed an evaluation for the Ohio Division of Disability Determination to assess Mr. Plezia's mental functioning. Dr. Wagner observed that Mr. Plezia was cooperative, dressed casually, and had adequate grooming and hygiene. (Tr. 1233). Mr. Plezia displayed normal rate of speech; no loose associations, flight of ideas, or delusional beliefs; and an adequate level of understanding. (*Id.*). Dr. Wagner observed that Mr. Plezia presented as anxious with restricted affect, but he maintained consistent eye contact during the interview and displayed adequate energy to complete the evaluation process. (*Id.*).

Dr. Wagner opined that Mr. Plezia did not have difficulty understanding and responding to questions, and the tasks performed by Mr. Plezia did not suggest he had difficulty understanding or remembering instructions. (*See* Tr. 1235). Dr. Wagner further opined that Mr. Plezia appeared to have difficulty with attention and focus based on the need for regular repetition of questions, but he adequately completed tasks that assessed attention during the evaluation. (*Id.*). Dr. Wagner stated that Mr. Plezia's level of energy, persistence, and pace were adequate. (*Id.*). Dr. Wagner explained that Mr. Plezia presented as depressed, which might impact interpersonal interaction in a work setting, including limited or negative social interaction. (*Id.*). Dr. Wagner believed Mr.

Plezia presented as highly anxious when discussing current pressures, which might impact his mood stability in a competitive work setting. (Tr. 1236). However, Dr. Wagner also noted that Mr. Plezia's presentation was not indicative of intellectual or cognitive limitations, which would impact his ability to manage normal work pressures. (*Id.*). Finally, Dr. Wagner opined that Mr. Plezia reported problems managing pressure in daily activities, which contributed to avoidance completing daily tasks and problems managing pressure in work settings that contributed to avoidance and missed work. (*Id.*).

### 3. *Treating Providers*

#### a. Dr. Alok Bhaiji, M.D.[2]

##### 1) October 2020 Work Capacity Form

On October 18, 2020, Dr. Bhaiji, Mr. Plezia's long-term treating physician, submitted a checkbox work capacity form to the Ohio Bureau of Workers' Compensation. (Tr. 1230). Dr. Bhaiji opined that Mr. Plezia could return to work with temporary restrictions due to non-work-related injury disease from October 12, 2020 to November 12, 2020. (*Id.*). Dr. Bhaiji opined that Mr. Plezia could occasionally lift/carry up to 10 pounds and push/pull up to 25 pounds; never lift/carry 11 to 100 pounds, bend, twist/turn, reach below his knee, squat/kneel, and stand/walk; continuously sit; and frequently not lift above his shoulders. (*Id.*). As a basis for his opinion, Dr. Bhaiji explained that "[p]ersist[e]nt pain and symptoms with prolonged standing, walking, bending/squatting and heavy lifting" would result in Mr. Plezia being unable to perform any work. (*Id.*).

---

[2] From the ALJ's decision, it appears that Dr. Bhaiji submitted other opinions. (Tr. 178-80). Because Mr. Plezia's arguments revolve around two specific opinions, this summary will only include discussion of those specific opinions.

### 2)  December 2020 Physical Medical Source Statement

On December 4, 2020, Dr. Bhaiji completed a checkbox form where he opined that Mr. Plezia could never stand or walk; never balance or crouch; never push or pull; and was affected by noise, temperature extremes, and pulmonary irritants. (Tr. 1353-54). Dr. Bhaiji also opined that Mr. Plezia could occasionally lift 10 pounds and frequently lift 0 pounds, and can sit for two hours total and one hour without interruption during an eight-hour work day. (Tr. 1353). Dr. Bhaiji also noted that Mr. Plezia had been prescribed a cane, brace, TENS unit, and handicap placement card. (*Id.*). Dr. Bhaiji further noted that Mr. Plezia may need to change positions frequently due to pain; experiences severe pain that interferes with his concentration, takes him off task, and causes absenteeism; and would require the ability to "seldomly" elevate his legs to 90 degrees at will. (Tr. 1354).

 Dr. Bhaiji wrote that these limitations were supported by "MRI findings, multiple work-related injuries, and multiple not-at-fault car accident injuries over the past [four] years." (*Id.*). He did not explain which MRI findings explained these limitations, how they explained the limitations, or how they could support environmental limitations such as those related to noise or temperature. (*See* Tr. 1353-54).

### b.  Ms. Pamela Pardon, CNP

On December 3, 2020, Ms. Pardon, a certified nurse practitioner, completed a checkbox mental health opinion form for Mr. Plezia after treating him for less than two months. (Tr. 1348-49). Regarding Mr. Plezia's ability to understand, remember, or apply information, Ms. Pardon opined that Mr. Plezia had moderate limitations in his ability to understand and learn terms, instructions, or procedures; follow one or two-step oral instructions to carry out a task; recognize a mistake and correct it; identify and solve problems; sequence multi-step activities; and use reason

9

and judgment to make work-related decisions. (Tr. 1348). Ms. Pardon also opined that Mr. Plezia had mild limitations in his ability to ask and answer questions and provide explanations, and no limitation in his ability to describe work activity to someone else. (*Id.*).

With respect to Mr. Plezia's ability to interact with others, Ms. Pardon opined that Mr. Plezia had extreme limitations in his ability to cooperate with others; ask for help when needed; handle conflicts with others; respond to requests, suggestions, criticism, correction, and challenges; and keep social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness. (*Id.*). Ms. Pardon also opined that Mr. Plezia had marked limitations in his ability to initiate or sustain conversation; mild limitation in his ability to state his own point of view; and no limitation in his ability to understand and respond to social cues. (*Id.*).

Regarding Mr. Plezia's ability to concentrate, persist, or maintain pace, Ms. Pardon opined that Mr. Plezia had extreme limitations in his abilities to complete tasks in a timely manner; ignore or avoid distractions while working; change activities or work settings without being disruptive; work close to or with others without interruption or distracting them; and work a full day without needing more than the allotted number or length of rest periods during the day. (Tr. 1349). Ms. Pardon further opined that Mr. Plezia had moderate limitation in his abilities to initiate and perform a task that he understands and knows how to do, and to sustain an ordinary routine and regular attendance at work. (*Id.*).

With respect to Mr. Plezia's ability to adapt or manage himself, Ms. Pardon opined that Mr. Plezia had extreme limitations in his abilities to respond to demands; adapt to changes; manage his psychologically based symptoms; and distinguish between acceptable and unacceptable work performance. (*Id.*). Ms. Pardon also opined that Mr. Plezia had marked limitations in his abilities to set realistic goals and make plans for himself independent of others, and moderate limitations

10

in his abilities to maintain personal hygiene and attire appropriate to a work setting, and to be aware of normal hazards and take appropriate precautions. (*Id.*).

Finally, as support for her assessment, Ms. Pardon listed Mr. Plezia's diagnoses of major depressive disorder, severe generalized anxiety disorder, and attention deficit hyperactivity disorder. (*Id.*). Ms. Pardon also listed Mr. Plezia's reported symptoms of low motivation and energy, tiredness/fatigue, sadness, excessive worry, feelings of doom/gloom, helplessness, nervousness, binge eating, excessive weight gain, and sleep disturbance. (*Id.*).

### D. Relevant Medical Evidence

#### 1. *Physical Impairments*

On January 29, 2020, Mr. Plezia went to an emergency room with complaints of lumbar pain after an incident at work. (Tr. 796). Upon examination, Mr. Plezia exhibited costovertebral angel tenderness, lumbar midline vertebral tenderness, and left lumbar paraspinal tenderness with positive straight leg raise testing bilaterally. (Tr. 797). His blood pressure was 172/97. (Tr. 800). However, he had normal back range of motion and normal strength; had normal sensory, motor, and speech; and was cooperative. (Tr. 797-98). No neurological deficits were observed. (Tr. 798). There were "no red flags" for acute cord compression. (Tr. 799). A CT scan of his lumbar spine demonstrated L4-5 small protrusive disc bulge, left more than right, that caused mild/moderate spinal canal stenosis. (Tr. 794-95, 799).

Following his work injury, Mr. Plezia attended Ohio Bureau of Workers' Compensation appointments with Dr. Alok Bhaiji, M.D. On January 30, 2020, Mr. Plezia attended an appointment with Dr. Bhaiji. Upon examination, Mr. Plezia exhibited lumbar range of motion to 35 degrees with flexion, 10 degrees with extension, 15 degrees with lateral flexion, 10 degrees with right lateral flexion, and 35 degrees with rotation. (Tr. 1069). Mr. Plezia had difficulty getting off the

examination table. Straight leg raise testing produced increased lower back pain bilaterally. (*Id.*). Dr. Bhaiji diagnosed Mr. Plezia with strain of muscle, fascia, and tendon of lower back and other intervertebral disc displacement, lumbar region. (*Id.*). Dr. Bhaiji recommended chiropractic care. (Tr. 1070).

On March 5, 2020, Mr. Plezia attended a reevaluation with Dr. Bhaiji after completing chiropractic care. Upon examination, Mr. Plezia exhibited muscle hypertonicity, tenderness to palpation, and joint dysfunction in the middle and lower lumbar region. (Tr. 992). Straight leg raise testing, Yeoman's testing, Kemp's testing, and Bechterew's testing were positive bilaterally. (*Id.*). Dr. Bhaiji felt that Mr. Plezia was responding to care with increased range of motion and some decrease in pain levels. (Tr. 993). Dr. Bhaiji recommended physical therapy, a lumbar MRI, and a pain management consultation. (*Id.*).

A May 25, 2020, a lumbar spine MRI revealed bilateral facet hypertrophy involving the lower lumbar region, circumferential epidural lipomatosis most prominent at L4-5 and L5-SI, significant narrowing of the thecal sac at L5-S1, and mild bilateral neural foraminal narrowing at L4-5, as well as no bony central canal stenosis. (Tr. 856-57).

On June 5, 2020, Mr. Plezia had an appointment with Dr. Bhaiji to discuss the MRI finding because Mr. Plezia continued to have nonspecific lower back pain. (Tr. 955). Dr. Bhaiji noted that Mr. Plezia recently began the approved course of skilled physical therapy and reported some reductions of pain and symptoms as a result. (*Id.*). Dr. Bhaiji did not feel that Mr. Plezia appeared to require any surgical intervention. (*Id.*). Dr. Bhaiji instructed Mr. Plezia to continue physical therapy. (*Id.*).

On June 26, 2020, Mr. Plezia returned for an appointment with Dr. Bhaiji. Although Mr. Plezia reported continued lower back pain, he stated that the "constant pain is beginning to

improve." (Tr. 924). He reported that he still has increased pain with sitting, standing, walking, bending, lifting, and lying down. (*Id.*). Upon examination, Mr. Plezia's range of motion remained limited and painful in all directions tested, but there had been increases in his range of motion since the last appointment. (*Id.*). Dr. Bhaiji assessed that Mr. Plezia continued to demonstrate pain and deficits  from his work injury and remained "unable to work in any capacity at th[at] time." (*Id.*). Dr. Bhaiji advised Mr. Plezia on sleeping positions and activities of daily living modifications to help reduce pain. (*Id.*).

At a physical therapy appointment on July 10, 2020, Mr. Plezia reported 7/10 pain and explained that he was working on his car the prior day, which increased his lower back pain symptoms at this appointment. (Tr. 901).

On August 26, 2020, Dr. Bhaiji noted that Dr. Bhaiji's request for additional physical therapy had been denied by the Ohio Bureau of Workers' Compensation. (Tr. 1092). The objective findings included limited and painful lumbar region range of motion and muscle hypertonicity throughout. (*Id.*). Dr. Bhaiji again noted that physical therapy had been denied, and he continued Mr. Plezia off work on September 22, 2020. (Tr. 1213).

On December 4, 2020, Mr. Plezia reported that he continued to have some problems with his low back and difficulty going from a sitting to standing position. (Tr. 1435). Upon examination, Mr. Plezia had pain in his lumbar spine with movement and restricted flexion, extension, and rotation. (*Id.*). Dr. Bhaiji continued Mr. Plezia on work restrictions until February 2021, but there was no further plan because physical therapy had been denied with a pending appeal. (*Id.*).

On November 18, 2020, Mr. Plezia attended an appointment with Dr. Daniel Zanotti, M.D. (Tr. 1585). Mr. Plezia complained at the appointment of left arm pain that started on October 27, 2020. (*Id.*). Upon examination, Mr. Plezia exhibited limited extension and "pain with rotation to

the left", tenderness in the trapezius and down into the shoulder, and pain down the outside of the arm to the elbow with impingement maneuvers. (Tr. 1586). A left shoulder x-ray revealed good alignment of the glenohumeral joint, maintained joint spaces, and no evidence of any acute bony abnormality. (Tr. 1596). Dr. Zanotti opined that Mr. Plezia had a cervical sprain with radiculopathy and left shoulder impingement. (Tr. 1585). Dr. Zanotti believed that Mr. Plezia was getting pain diffusely in multiple joints, especially his neck, shoulder and elbow, but Mr. Plezia had good strength and motion with no significant rotator cuff abnormality. (Tr. 1586). Dr. Zanotti recommended medication and therapy. (*Id.*).

On January 6, 2021, Mr. Plezia had another appointment with Dr. Zanotti. Mr. Plezia reported he was still experiencing "burning pain" in the back of his arm down into the elbow. (Tr. 1583). Mr. Plezia reported that he felt therapy "may have helped" his left shoulder and neck. (*Id.*). Upon examination, there was some mild pain in the shoulder with impingement maneuvers and slight soreness posteriorly in the elbow near the cubital tunnel, but no numbness or tingling in the hand. (*Id.*). Mr. Plezia had 5/5 abduction, supraspinatus strength, and rotational strength at the side. (*Id.*). He exhibited normal strength, motion, and stability in the lower extremity. (*Id.*). A cervical spine x-ray demonstrated a loss of lordosis, but decent disc height and vertebral alignment throughout and no acute abnormality. (Tr. 1595). Dr. Zanotti recommended that Mr. Plezia continue physical therapy. (Tr. 1583-84).

From December 3, 2020 until to January 13, 2021, Mr. Plezia attended physical therapy for left shoulder pain. (Tr. 1597-1626). On January 13, 2021, Mr. Plezia reported feeling "much better lately." (Tr. 1620). After attending only eight sessions, Mr. Plezia was discharged from treatment after Dr. Zanotti recommended Mr. Plezia discontinue physical therapy. (Tr. 1621).

14

On January 20, 2021, Mr. Plezia returned to Dr. Zanotti with complaints of right hand pain. (Tr. 1580). His right hand x-ray showed no evidence of any acute bony abnormality and maintained joint spaces. (Tr. 1594). Upon examination, Mr. Plezia had obvious swelling of the right wrist and limited wrist extension and flexion due to pain. (Tr. 1581). He was able to wiggle his fingers, but he could not make a full fist. (*Id.*). He exhibited better elbow and hand motion of the left side and good grip strength on the left. (*Id.*). Strength, motion, and stability in his lower extremity was normal. (*Id.*). Dr. Zanotti stated that Mr. Plezia was doing better on his left side with therapy. Mr. Plezia, however, continued to experience multiple joint flareups and still had not sought medical treatment for his gout, despite several recommendations by health care providers to do so. (*Id.*). Dr. Zanotti gave Mr. Plezia cochicine as a one-time prescription and again recommend that Mr. Plezia see a rheumatologist. (*Id.*).

On March 1, 2021, Mr. Plezia was seen for reported hearing loss. (Tr. 1483). He endorsed trouble hearing and tinnitus, which he attributed to his years working in the trucking industry that had exposed him to frequent loud noises. (Tr. 1483, 1486-87). An audiogram demonstrated mixed hearing loss and evidence of eustachian tube dysfunction. (Tr. 1488).

On April 20, 2021, Mr. Plezia attended an appointment for gout with Dr. David Blumenthal, M.D. Mr. Plezia reported worsening gout with involvement of the wrist, elbows, feet, knees and ankles. (Tr. 1756). Mr. Plezia stated that he typically took indomethacin for gout attacks and had a prescription for colchicine, but he generally did not use it. (*Id.*). Upon examination, Mr. Plezia exhibited no active synovitis in any joint; good fist and grip; normal range of motion without synovial proliferation or joint effusion in his wrists; full extension with no synovial proliferation in his elbows; normal shoulder range of motion in abduction; cool knees with no synovial proliferation or joint effusion; and no synovial proliferation in his ankles. (Tr. 1758). Dr.

Blumenthal diagnosed Mr. Plezia with gout, increased Mr. Plezia's dosage of allopurinol, and prescribed colchicine. (Tr. 1756).

## 2. *Mental Impairments*

On October 5, 2020, Mr. Plezia began mental health treatment with Ms. Pardon, a certified nurse practitioner. (Tr. 1253). He reported expression depression and anxiety for eight months following his workplace injury. (*Id.*). He described the following signs and symptoms related to his mental health: decreased motivation; lack of interest and pleasure in activities once enjoyed; sadness; excessive worry; nervousness; binge eating with excessive weight gain; and sleep disturbance. (*Id.*). He listed his stressors as an inability to work due to back pain, decrease in physical mobility related to back pain, moderate weight gain, difficult moving around physically, and financial problems. (*Id.*). Upon mental status examination, Mr. Plezia had a flat affect and appeared anxious, fearful, gloomy, glum, and with a sad mood. (Tr. 1342). However, Mr. Plezia's orientation, appearance, attention, vigilance, concentration, speech, rate of thoughts, reasoning, thought content, and thought process were normal. (*Id.*). His long-term and short-term memory were intact. (*Id.*). Ms. Pardon diagnosed Mr. Plezia with major depressive disorder, recurrent episode, moderate, and generalized anxiety disorder. (Tr. 1346).

On October 19, 2020, Mr. Plezia continued his treatment with Ms. Pardon. He reported that Wellbutrin "seem[ed] to be working" because he had been less irritable and agitated, but he continued to experience sadness, low mood, daily tearfulness, loss of interest and lack of motivation. (Tr. 1256). Upon mental status examination, Mr. Plezia had an anxious and sad mood with an affect that was consistent with mood, and normal and a mild impairment of attention, vigilance, and concentration. (Tr. 1260). The examination findings were otherwise similar to findings from October 5, 2020. (*See id.*). Ms. Pardon continued Mr. Plezia on bupropion. (Tr.

1260). On November 5, 2020, Ms. Pardon increased Mr. Plezia's dosage of bupropion. (Tr. 1265).
On November 19, 2020, Ms. Pardon made no changes to Mr. Plezia's medications. (Tr. 1269). Mr.
Plezia reported that he was doing "a little bit better" with Wellbutrin, but he continued to complain
of an inability to focus and poor concentration. (Tr. 1267).

On December 3, 2020, Mr. Plezia's mental status examination revealed that he had a sad,
depressed, and anxious mood with a congruent affect that was normal in range and modulation.
(Tr. 1300). However, he was appropriately dressed, with adequate grooming and hygiene. (*Id.*).
He exhibited cooperative behavior with good eye contact and normal psychomotor activity. (*Id.*).
His thought process was goal-directed, organized, and logical. (*Id.*). Mr. Plezia had intact insight,
judgment, recent memory, remote memory, and attention. (*Id.*). Ms. Pardon noted that Mr. Plezia
continued to report symptoms of depression and anxiety, but felt his depressive symptoms were
slightly improved with Wellbutrin. (Tr. 1304). Mr. Plezia's additional appointments with Ms.
Pardon on February 1, 2021, and February 17, 2021, reflect similar mental status findings to those
from December 3, 2020. (*See* Tr. 1292, 1294).

On March 2, 2021, Mr. Plezia reported elevated depressive symptoms and anxiety. (Tr.
1665). He stated that he had gone out at least one day a week to socialize with friends, which had
made him feel better. (*Id.*). He felt that Wellbutrin continued to be effective. (*Id.*). Upon mental
status examination, Mr. Plezia had a sad, depressed, and anxious mood with a congruent affect
that was normal in range and modulation. (Tr. 1664). However, Mr. Plezia was appropriately
dressed, with adequate grooming and hygiene. (*Id.*). He exhibited cooperative behavior with good
eye contact and normal psychomotor activity; goal directed, organized, and logical thought
process; and intact insight, judgment, recent memory, remote memory, and attention. (*Id.*).

Ms. Pardon's treatment notes from March 30, 2021, reveal that Mr. Plezia continued to take Wellbutrin, but the medication did not improve his symptoms of anxiety or attention deficit hyperactivity disorder ("ADHD"). (Tr. 1662) Ms. Pardon noted that she needed to evaluate and assess possible diagnoses for adult ADHD and post-traumatic stress disorder. (*Id.*). Mr. Plezia continued to report mental health symptoms at appointments on April 19, 2021, May 10, 2021, and June 2, 2021. (Tr. 1649-55).

On June 28, 2021, Mr. Plezia reported that he had been "depressed a lot lately." (Tr. 1655). He complained of financial stressors and difficulty dealing with the general public. (*See* Tr. 1656). He reported planning to go to a family event and a party with former school friends. (*Id.*). Upon mental status examination, Mr. Plezia had a sad, depressed, and anxious mood, with a congruent affect that was normal in range and modulation. (Tr. 1658-59). However, he was appropriately dressed with adequate grooming and hygiene; exhibited cooperative behavior with good eye contact and normal psychomotor activity; and demonstrated goal directed, organized, and logical thought process and intact insight, judgment, recent memory, remote memory, and attention. (*Id.*).

## IV.    THE ALJ'S DECISION

In her September 2021 decision, the ALJ determined that Mr. Plezia had not engaged in substantial gainful activity since January 29, 2020, the alleged onset date. (Tr. 166). The ALJ further determined that Mr. Plezia had the following severe impairments: degenerative disc disease, bipolar and related disorders, obesity, essential hypertension, osteoarthrosis and allied disorders, and trauma and stressor-related disorders. (*Id.*). The ALJ, however found none of these impairments—individually or in combination—met or medically equaled the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1. (*Id.*).

The ALJ also determined that Mr. Plezia could perform light work, except that he can occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, or crawl; have frequent interaction with supervisors, co-workers, and the public; cannot work at a production rate pace; and is limited to routine workplace changes. (Tr. 170). The ALJ next determined that Mr. Plezia is unable to perform any past relevant work. (Tr. 181). She also determined that transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a "not disabled" finding, regardless of whether Mr. Plezia has transferable job skills. (Tr. 182). However, the ALJ determined that, considering Mr. Plezia's age, education, work experience, and residual functional capacity, that there are jobs that exist in significant numbers in the national economy that he could perform. (Tr. 182-83). These jobs included an inspector and hand packager, small products assembler, and mail clerk. (*Id.*). Accordingly, the ALJ determined that Mr. Plezia was not disabled. (Tr. 183).

## V.    LAW AND ANALYSIS

### A.    Standard of Review

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than

a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip*, 25 F.3d at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

### B.  Standard for Disability

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments,

meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.*

### C.  Medical Opinion Evaluation

The Social Security Administration's regulations governing the evaluation of medical opinions provide that "administrative law judges will now evaluate the 'persuasiveness' of medical opinions by utilizing the five factors listed in paragraphs (c)(1) through (c)(5) of the regulation." *Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020) (quoting *Gower v. Saul*, No. 4:19-CV-00058-HBB, 2020 WL 1151069, at *4 (W.D. Ky Mar. 9, 2020) (citing 20 C.F.R. § 404.1520c(a) and (b)). The five factors are supportability, consistency, relationship with the claimant, specialization, and other factors, with supportability and consistency acknowledged to be the most important factors for consideration. 20 C.F.R. § 404.1520c(c)(1)-(5); 20 C.F.R. § 404.1520c(b)(2).

An ALJ is required to explain how consistency and supportability were considered. 20 C.F.R. § 404.1520c(b)(2). He "may, but [is] not required to, explain how [he] considered the [other] factors." *Id.* The regulations define "supportability" as "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or

her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1). The regulations define "consistency" as "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

### D.  <u>The ALJ Properly Discounted the Opinions of Dr. Bhaiji and Ms. Pardon</u>

Mr. Plezia raises one assignment of error: that the ALJ erred in analyzing the persuasiveness of the medical opinions of Dr. Bhaiji and Ms. Pardon, his treating providers. (ECF Doc. 8, PageID#1790). Mr. Plezia also argues that the ALJ erred in relying on state agency opinions. (*Id.* at PageID#1804). The Commissioner responds that the ALJ properly evaluated the opinions of Dr. Bhaiji and Ms. Pardon. (ECF Doc. 10, PageID#1811-12). Further, the Commissioner contends that Mr. Plezia's state agency opinions argument should be waived because it is underdeveloped. (*Id.* at PageID#1813). Alternatively, the Commissioner asserts that the ALJ did not err because Mr. Plezia points to no medical finding that the state agency doctors did not see that would have changed the outcome, and the ALJ considered post-opinion evidence. (*Id.*). For the following reasons, I find the Commissioner's argument is well-taken.

#### 1.  *The ALJ Appropriately Evaluated the Persuasiveness of Dr. Bhaiji's Opinions.*

Mr. Plezia argues that the ALJ "erred in drawing conclusions premised off of medical knowledge she does not possess," and that Dr. Bhaiji's opinions "ought to have been given deference." (ECF Doc. 8, PageID#1803). Specifically, Mr. Plezia argues that it is "clear from the record" that he experiences severe chronic pain that interferes with his everyday life and prevents him from consistently performing activities of daily living. (*Id.* at PageID#1802). Because Dr.

Bhaiji was Mr. Plezia's long-term primary care physician, "possesse[d] the favored longitudinal view of h[is] chronic pain, and was best equipped to assess his general physical functioning," Mr. Plezia argues that the ALJ's decision should be remanded so that Dr. Bhaiji's "central findings" can be integrated into Mr. Plezia's assigned RFC. (*Id.* at PageID#1803). This argument is not well-taken.

First, I note that Mr. Plezia, represented by counsel, makes a vague argument that fails to demonstrate *what conclusion* he believes the ALJ reached without medical knowledge. (*See generally id.* at PageID#1802-03). Next, Mr. Plezia's argument that the ALJ had to defer to Dr. Bhaiji because his long-term primary care physician "possesse[d] the favored longitudinal view of [his] chronic pain, and was best equipped to assess his general functioning" runs contrary to case law. (*Id.* at PageID#1803). It is true that an ALJ may not make medical judgments or substitute her opinions for that of a physician. *See Meece v. Barnhart*, 192 F. App'x 456, 465 (6th Cir. 2006) ("But judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor.") (quoting *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990)). But an ALJ "does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rending a residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009). To the contrary, "the ALJ is charged with the responsibility of determining the RFC based on her evaluation of the medical and non-medical evidence…[and] has final responsibility for deciding an individual's RFC." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013); *see also Conner v. Comm'r of Soc. Sec.*, 658 F. App'x 248, 253-54 (6th Cir. 2016) ("An example of a good reason is that the treating physician's opinion is 'unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence.'") (citing *Morr v. Comm'r of Soc. Sec.*, 616 F. App'x

210, 211 (6th Cir. 2015)); *see also Keeler v. Comm'r of Soc. Sec.*, 511 F. App'x 472, 473 (6th Cir. 2013) (holding that an ALJ properly discounted the subjective evidence contained in a medical provider's opinion because it too heavily relied on the patient's complaints).

Here, the ALJ pointed to evidence contradicting Dr. Bhaiji's opined limitations for Mr. Plezia. Specifically, the ALJ observed that Dr. Bhaiji's opinions ran contrary to other clinical findings, including but not limited to no active synovitis in any joint and "normal lower extremity strength, motion and stability." (Tr. 178-80). The ALJ supported her conclusion with citations to those findings in her persuasiveness discussion, and she addressed those records at more length earlier in her decision. (Tr. 176, 178-180; *see* Tr. 1581, 1584, 1758). "Where the opinion of a treating physician is not supported by objective evidence or is inconsistent with the other medical evidence in the record, this Court generally will uphold an ALJ's decision to discount that opinion." *See Price v. Comm'r of Soc. Sec.*, 342 F. App'x 172, 175-76 (6th Cir. 2009). Furthermore, reading the decision as a whole, the ALJ also appeared to discount Mr. Plezia's subjective allegations due to his reported activities of working on his car, attempting to throw a football, driving to the casino, cleaning out his father's house, and going out with friends. (Tr. 176; *see* Tr. 901, 1645, 1649-50, 1653, 1666); *see Crum v. Comm'r of Soc. Sec.,* 660 F. App'x 449, 455 (6th Cir. 2016) (unpublished) (finding that the court should read the ALJ's decision as a whole).

Rather than "playing doctor," the ALJ properly reviewed the medical and other evidence in the record, relied on that evidence in determining whether the medical opinion evidence was supported, and determined the issues reserved to the Commissioner. *See Hobbs v. Comm'r of Soc. Sec.*, No. 5:18-cv-446, 2019 WL 315046, at *15 (N.D. Ohio Jan. 23, 2019); *Poe*, 342 F. App'x at 157 ("[A]n ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding."). Because Mr.

Plezia fails to establish error, I recommend that the Court reject his argument because it lacks merit.

## 2. The ALJ Appropriately Evaluated the Persuasiveness of Ms. Pardon's Opinion.

The ALJ discounted Ms. Pardon's opinion because it was unsupported, inconsistent with the record, and submitted in a checkbox form. (Tr. 181). Yet Mr. Plezia contends that these reasons "do not undermine" Ms. Pardon's "central finding" that Mr. Plezia's workplace injury made him extremely depressed and anxious, and his mental health symptoms made it difficult for him to interact with others and to adapt and manage his psychological symptoms. (ECF Doc. 8, PageID#1803-04 (citing Tr. 1348-49)). Specifically, he contends that his symptoms and their severity were "consistently noted" in Mr. Plezia's treatment records. (*Id.* (citing Tr. 1277, 1284, 1645, 1652)). This argument is not well-taken.

Here, the ALJ analyzed the persuasiveness of Ms. Pardon's opinion as follows:

The claimant's provider, Pamela D. Pardon, CNP, submitted a mental capacity medical source statement on December 3, 2020. Ms. Pardon believed that the claimant had a no limitation to a moderate limitation with understanding, remembering, or applying information. She felt that the clamant had no limitation to an extreme limitation with interacting with others. Ms. Pardon opined that the claimant had moderate to extreme limitations with concentration, persistence, or maintaining pace and adapting or managing oneself. She explained that the claimant had major depressive disorder, recurrent, severe, generalized anxiety disorder, and attention deficit hyperactivity disorder. Ms. Pardon stated that the claimant complained of low motivation and energy, tiredness/fatigue, sadness, excessive worry, feeling of doom and gloom, helplessness, nervousness, binge eating, excessive weight gain, and sleep disturbance. (C14F, 1-2/C15F, 3-4). I find the opinion of Ms. Pardon unpersuasive as it was check box form lacking an objective basis and it was not supported by Ms. Pardon's own mental status findings that include an affect that was normal in range and modulation, appropriately dressed with adequate grooming and hygiene, cooperative behavior with good eye contact, normal psychomotor activity, goal directed, organized, and logical thought process, able to accurately perform calculations, and intact insight, judgment, recent memory, remote memory, and attention. (C12F, 5-11; C13F, 57- 67; C29F, 1-14). The opinion was somewhat consistent with the testimony of the claimant,

but was not consistent with the opinions of the State Agency psychologists or the Consultative Psychological Examiner.

(Tr. 181.)

First, the ALJ reasonably considered the supportability of Ms. Pardon's opinion and gave clear reasons for the ALJ's conclusion that it was not supported. Specifically, T=the ALJ first noted that Ms. Pardon's opinion was a checkbox form "lacking an objective basis." (*Id.*). Several courts within the Sixth Circuit have found that check-box opinions are unsupported and are itself a valid reason to discount a medical opinion. *See Marks v. Comm'r of Soc. Sec.*, No. 1:16-cv-02838, 2018 WL 1801609, at *8 (N.D. Ohio Jan. 12, 2018) ("Numerous decisions have found that the use of a checklist or check-the-box-forms in which the doctor provides little or no accompanying explanation for the assessed limitations…are unsupported and, therefore, the ALJ may properly discount the treating source opinions.") (citing *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 630 (6th Cir. 2016)); *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 475 (6th Cir. 2016) (stating that check-box opinions are "weak evidence at best" (citations omitted)).

Here, Ms. Pardon's opinion consists of checked boxes rating Mr. Plezia's level of impairment in several areas of functioning. (*See generally* Tr. 1348-49, 1399-1400). The cursory explanation that Ms. Pardon provided in support was that Mr. Plezia was diagnosed with major depressive disorder, generalized anxiety, disorder, and attention deficit hyperactivity disorder, and that Mr. Plezia's reported symptoms of low motivation and energy, tiredness/fatigue, sadness, excessive worry, feelings of doom/gloom, helplessness, nervousness, binge eating, excessive weight gain, and sleep disturbance. (Tr. 1349, 1400). The fact that Ms. Pardon provided a checkbox opinion that included little to no explanation—and Mr. Plezia does not meaningfully contest the ALJ's characterization (*see* ECF Doc. 8, PageID#1803-04)—is a valid and accurate reason to discount the opinion. *See Kreilach v. Comm'r of Soc. Sec.*, 621 F.Supp.3d 836, 848 (N.D. Ohio

Aug. 15, 2022) (finding that medical source's questionnaires were check box forms where the medical sources "checked boxes and wrote cursory statements about the supporting clinical findings and [p]laintiff's prognosis"); *Duke v. Comm'r of Soc. Sec.*, No. 21 CV 39, 2022 WL 1075171, at *4 (N.D. Ohio Apr. 11, 2022) (finding that medical source's form was a check box form where the form included check boxes and listed claimant's asthma and POTS diagnoses; described treatment as "medications; listed symptoms; and stated that the medical findings were a "fast heart rate and low blood pressure"); *Laney v. Comm'r of Soc. Sec.*, No. 5:21-CV-01290-CEH, 2022 WL 2176539, at *6 (N.D. Ohio June 16, 2022).

But the ALJ's reasoning did not stop there. The ALJ articulated an additional reason for discounting the opinion's supportability, despite finding Ms. Pardon's opinion constituted a checkbox form. Specifically, the ALJ appropriately reasoned that Ms. Pardon's own mental status findings for Mr. Plezia included "an affect that was normal in range and modulation, appropriately dressed with adequate grooming and hygiene, cooperative behavior with good eye contact, normal psychomotor activity, goal-directed, organized, and logical thought process, able to accurately perform calculations, and intact insight, judgment, recent memory, remote memory, and attention." (Tr. 181). This conclusion finds support in the record. (*See, e.g.*, Tr. 1257, 1260-61, 1342, 1344, 1644-45, 1658-59).

The ALJ also reasonably determined the opinion was somewhat consistent with Mr. Plezia's testimony but was inconsistent with the opinions of the state agency psychologists and the consultative psychological examiner. (Tr. 181). Indeed, the state agency psychologists opined much less restrictive limitations for Mr. Plezia's mental RFC. (Tr. 575-76, 582, 585-86, 594-96, 598-99, 609-10). Similarly, Dr. Wagner (the consultative examiner) also did not opine limitations as restrictive as those opined by Ms. Pardon. (Tr. 1235-36).

27

Mr. Plezia offers record evidence where his reported symptoms would support Ms. Pardon's opinions, but this amounts to a request for this Court to reweigh the evidence. Reweighing evidence is not permitted at this stage of review. *See Moruzzi v. Comm'r of Soc. Sec.*, 759 F. App'x 396, 406 (6th Cir. 2018) ("We decide only whether there was substantial evidence to support the ALJ's RFC determination. If so, we defer to that decision even in the fact of substantial evidence supporting the opposite conclusion.") (internal citations omitted); *Harrod v. Comm'r of Soc. Sec.*, No. 3:17CV1839, 2018 WL 3869897, at *16 (N.D. Ohio Aug. 15, 2018) ("Although Plaintiff clearly believes the ALJ should have assessed more restrictive limitations based on her interpretation of the medical record, that belief does not establish a violation of the substantial evidence standard."). The ALJ's decision is not subject to reversal "merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citation omitted).

Here, as discussed above, the ALJ articulated accurate and valid reasons supported by substantial evidence. This provided an accurate and logical bridge for the ALJ's finding that Ms. Pardon's opinion was unpersuasive. Mr. Plezia does not establish any error in the ALJ's analysis. Accordingly, I recommend that the Court reject this argument because it lacks merit.

### 3. *The ALJ Properly Determined that the State Agency Opinions Were Persuasive.*

Finally, Mr. Plezia, represented by counsel, argues without citation to case law that the ALJ erred in giving deference to the findings of the state agency consultants rather than the opinions of Dr. Bhaiji and Ms. Pardon. (ECF Doc. 8, PageID#1804). He contends that the state agency opinions were "issued only via a review of the medical records available through October of 2020." (*Id.*). He asserts that these medical opinions limiting him to the light exertional capacity were "simply not in line with the medical record." (*Id.*). The Commissioner responds that Mr.

Plezia waived this argument because it is not fully developed. (ECF Doc. 10, PageID#1813). In the alternative, to the extent Mr. Plezia's argument is construed to mean that the ALJ should not have found the state agency opinions persuasive because the state agency consultants did not have access to later medical records, the Commissioner asserts this argument fails.  That is so because Mr. Plezia does not point to any medical findings that the doctors did not see that would have changed the outcome. (*Id.*). The Commissioner's arguments are well-taken.

      As an initial matter, I note that Mr. Plezia's argument is conclusory and underdeveloped. Mr. Plezia fails to specify *what* findings were inconsistent with *which* records or *how* these findings were inconsistent. (*See* ECF Doc. 8, PageID#1804). And without any case law from Mr. Plezia to guide this legal inquiry (*see id.*), it is unclear how one could address his assertion. Thus, I deem this argument waived for failure to articulate an argument. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to … put flesh on its bones."); *Sanchez v. Miller*, 792 F.2d 694, 703 (7th Cir. 1986) ("It is not the obligation of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel.").

      Even if Mr. Plezia had not waived this argument, I find that it lacks merit. Mr. Plezia appears to argue that the ALJ's overall persuasiveness evaluations of the opinions of Dr. Bhaiji and Ms. Pardon was error because the state agency physicians did not have access to later medical records. (*See* ECF Doc. 8, PageID#1804). But "saying it does not make it so." *GTE Serv. Corp. v. FCC*, 205 F.3d 416, 426 (D.C. Cir. 2000). Despite arguing that the ALJ's findings were "simply not in line with the medical record," Mr. Plezia fails to point to *any* medical finding that the state

agency doctors did not see that would have changed their conclusions. Further, the ALJ's decision reflects that she considered the post-opinion evidence. (*See generally* Tr. 172-75 (discussing medical records dating after October 2020 and April 2021, when the state agency physical consultants issued their opinions at the initial and reconsideration review levels)); *see also McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009) ("McGrew also argues that the ALJ improperly relied on the state agency physicians' opinions because they were out of date and did not account for changes in her medical conditions. It is clear from the ALJ's decision, however, that he … took into account any relevant changes in McGrew's condition."). Accordingly, I recommend that the Court reject this argument because it lacks merit.

## VI.    RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the Commissioner's decision.

Dated: August 17, 2023                              s/ *Jennifer Dowdell Armstrong*
                                                   Jennifer Dowdell Armstrong
                                                   U.S. Magistrate Judge

## VII.    NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings

or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d 505). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).